IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 4:05CR3066 |
| | ) | |
| v. | ) | |
| | ) | |
| HENRY AVIMAEL SALAZAR, | ) | MEMDORANDUM AND ORDER ON THE |
| | ) | DEFENDANT'S OBJECTIONS TO THE |
| Defendant. | ) | MAGISTRATE JUDGE'S REPORT AND |
| | ) | RECOMMENDATION |

The defendant, Henry Avimael Salazar, has moved to suppress evidence obtained by a law enforcement officer during a traffic stop. (See Mot. to Suppress, filing 11.) A hearing on this motion was held before United States Magistrate Judge David L. Piester on July 13, 2005, (see filing 15), and, pursuant to 28 U.S.C. § 636(b)(1)(B)-(C), the magistrate judge has recommended that I deny the defendant's motion to suppress, (see filing 14; see also Transcript, filing 18 (hereinafter Tr.), at 77:15-80:14[1]). Now before me are the defendant's objections to the magistrate judge's report and recommendation. (See filing 25.) In the course of my de novo review of those portions of the magistrate judge's report that the defendant challenges, see United States v. Lothridge, 324 F.3d 599, 600 (8th Cir. 2003); 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b), I have studied the magistrate judge's report and recommendation; the transcript of the July 13 hearing; the exhibits received into evidence at the hearing (see filing 16); and the briefs submitted by the defendant in support of his motion to suppress and his objection to the report and recommendation (see filings 12, 26).[2] For the following reasons, I shall adopt the magistrate judge's report and recommendation and deny the defendant's motion to suppress.

---

[1] The magistrate judge's report and recommendation was made orally at the conclusion of the July 13 hearing.

[2] The government submitted no brief in opposition to the defendant's motion or in response to the defendant's objections to the report and recommendation.

1

## I.  BACKGROUND

The only witness who testified at the hearing of July 13, 2005, was Trooper Jeff Roby of the Nebraska State Patrol (NSP).  (See filing 17; see also Tr. at 7:4-7.)  Trooper Roby has been employed by the NSP for approximately nine years, and he has been assigned to traffic control duty for the past seven years.  (See Tr. at 7:10-15.)  His responsibilities include patrolling the area along Interstate 80 between the Shelton and York interchanges and watching for "violations of any federal, state and local laws, primarily those that deal with traffic enforcement."  (See id. at 7:19-8:5.)

At approximately 9:15 a.m. on April 22, 2005, Trooper Roby was positioned in his patrol car on the median of Interstate 80, facing west, when he observed a "green SUV-type vehicle" approaching.  (See Tr. at 9:1-22; 10:14-21; 43:3-7.)  Trooper Roby "started [his] radar clock, observed [the] vehicle slow very quickly and got a reading of 77 miles an hour on [his] radar."  (See id. at 9:22-24; see also id. at 12:3-9.)  The posted speed limit was 75 miles per hour.  (See id. at 10:22-24.)

Trooper Roby drove onto the interstate and followed the green vehicle into a construction zone, where the posted speed limit was reduced to 55 miles per hour.  (See Tr. at 11:5-9; 12:10-20.)  Although the trooper observed the green vehicle's brake lights flash on as the vehicle entered the zone, he believed that the vehicle was "still over" the 55 mile-per-hour limit.  (See id. at 12:19-22; 49:15-21.)  He therefore began to "pace" the vehicle through the construction zone by matching his speed to that of the other vehicle while watching his own speedometer.  (See id. at 12:22-13:3.)  In this manner he was able to observe that the green vehicle was traveling between 60 and 63 miles per hour through the zone.  (See id. at 13:8-12.)

Trooper Roby activated his Vascar unit, which is a device that is used to measure the average speed of another vehicle across a particular time and distance.  (See Tr. at 13:17-14:4.)  According to the Vascar unit, the green vehicle traveled at an average speed of 63.5 miles per hour in the construction zone; however, the trooper testified that in this case he operated the Vascar unit for less than one-eighth of a mile, which was less than half of the distance that he ordinarily used to obtain a speed reading.  (See id. at 14:5-13; 20:19-21.)  Also, Trooper Roby did not test the accuracy of his Vascar unit on the morning of April 22, 2005, before he used it to

estimate the green vehicle's speed.  (See id. at 16:8-19.)  He discovered later that the "calibration number was slightly off."  (See id. at 16:10-25.)  Trooper Roby opined that due to this calibration error, his Vascar readings were off by one or two miles per hour.  (See id. at 20:14-18.)

As the green vehicle exited the construction zone, Trooper Roby switched on his emergency lights.  (See Tr. at 21:4-5.)  The green vehicle stopped, and the trooper exited his patrol car and approached the green vehicle on the passenger's side.  (See id. at 21:6-8.)  The driver of the green vehicle–and its sole occupant–was the defendant.  (See id. at 21:9-17.)  At the trooper's request, the defendant produced a Utah driver's license bearing the name "Henry Avimael Salazar" and an insurance card naming Gustavo Rodriguez as the insured.  (See id. at 21:21-23:14; see also Exs. 2, 5.)  Trooper Roby explained the reason for the stop, and the defendant admitted that he was traveling at 60 miles per hour in the construction zone.  (See Tr. at 24:5-18.)[3]  The trooper then asked the defendant if he was the owner of the vehicle.  (See id. at 23:22-23.)  The defendant stated that the vehicle belonged to his friend.  (See id. at 23:25.)  However, after the trooper asked the defendant what his friend's name was, "[the defendant] seemed to at first not know it, then gave . . . the name that was on the insurance card as he was looking at it."  (Id. at 24:2-4.)  Trooper Roby asked the defendant about his destination, and the defendant responded that he was going to Nebraska.  (See id. at 24:22-25.)

Trooper Roby then asked the defendant if he would come to the patrol car to receive a speed warning.  (See Tr. at 25:2-4.)  The defendant complied.  (See id. at 25:5-6.)  Inside the patrol car, the trooper asked the defendant when he left Utah and where he was headed in Nebraska.  (See id. at 25:8-17.)  The defendant replied that he left Utah at approximately 4 o'clock on the previous day and that he was going to Omaha to meet family.  (See id.)  Trooper Roby then asked the defendant if he knew his family's address in Omaha, and the defendant responded that he did not have the address, but did have a phone number that he could use to call his family.  (See id. at 26:3-22.)  The defendant added that he believed the exit was "either 60 or 72," off the interstate.  (See id. at 26:6-8.)

Trooper Roby also asked the defendant how long he planned on staying in Omaha and

---

[3] The defendant's admission can be heard on the videotape of the traffic stop.  (See Ex. 1.)

3

whether he was on vacation from a job he held in Utah.  (See Tr. at 25:20-24.)  The defendant replied that he might stay for two to four days, but was not sure.  (See id.)  He also stated that he was on vacation from a towing job he held in Utah.  (See Tr. at 25:25-26:1.)  The trooper asked the defendant why he was traveling in a borrowed vehicle, and the defendant replied that his own vehicle was small and had "too many miles."  (See id. at 32:12-18.)

Meanwhile, Trooper Roby ran license and criminal history checks on the defendant.  (See Tr. at 26:25-27:1.)  The defendant asked the trooper whether he was "running" the defendant's license, and Trooper Roby responded that he was.  (See id. at 27:6-9.)  Trooper Roby then asked the defendant whether he had any speeding tickets, traffic violations, or arrests.  (See id. at 27:9-12.)  The defendant replied that he had taken care of his tickets.  (See id.)  He also stated that he had been arrested for an "INS violation" and a traffic violation.  (See id. at 27:17-23.)[4]

At this point, dispatch relayed the defendant's criminal history in code to Trooper Roby.  (See Tr. at 29:3-10; 33:9-17.)  This history included an "immigration violation, . . . interfering with a police officer[,] . . . possession of cocaine and possession of heroin."  (Id. at 29:14-16; see also 33:9-17.)

Trooper Roby and the defendant continued to speak as the trooper wrote the defendant a warning.  (See Tr. at 32:12-24.)  The defendant asked the trooper how much time it would take to reach Omaha, and the trooper replied that Omaha was approximately two hours away.  (See id. at 32:21-24.)  When Trooper Roby finished writing the warning, he "started" to hand back the defendant's registration.  (See id. at 33:24-34:1.)  However, he decided to run a license check on the vehicle "to make sure that it wasn't stolen or something to that effect."  (See id. at 34:1-3.)  Dispatch informed the trooper that the vehicle was registered to Gustavo Rodriguez, and that it was not stolen.  (See id. at 34:4-8; 55:13-15.)

At this point, Trooper Roby finished explaining the warning to the defendant and returned

---

[4]Generally, Trooper Roby's testimony is consistent with the videotape of his encounter with the defendant.  (See Ex. 1.)  However, as I listened to the videotape I could not verify that the defendant admitted to prior arrests for an "INS violation" or a "traffic violation."  Although the defendant's voice is relatively difficult to hear, it seems to me that he admitted to one arrest for failing to present identification to a police officer and another for failing to pay a ticket, which Trooper Roby described as a "suspension."  (See Ex. 1 at approximately 9:21:30.)

the defendant's license and "paperwork" to him. (See Tr. at 34:10-12.) At no time did the trooper tell the defendant that he was free to go. (See id. at 61:20-62:1.) The defendant asked the trooper whether the warning included a fine that had to be paid, and the trooper replied that it did not. (See id. at 34:12-14.) Trooper Roby then asked the defendant whether he could ask a few more questions, and the defendant responded affirmatively. (See id. at 34:20-22.) Trooper Roby asked whether the defendant had any weapons or drugs in the vehicle. (See id. at 34:21-35:3.) The defendant replied that he had no weapons or drugs; however, he admitted that he had once been arrested on a drug violation. (See Tr. at 34:25-35:6; Ex. 1 at approximately 9:26:00.) The trooper then asked the defendant whether he could search the vehicle, and the defendant responded affirmatively. (See Tr. at 35:8-13.) The vehicle was searched, and a "suspected controlled substance" was found. (See id. at 40:18-19.) Thereafter, Trooper Roby placed the defendant under arrest "for possession of a controlled substance with intent to deliver." (See id. at 40:23-24.)

      The defendant moved to suppress all evidence and statements obtained as a result of this encounter,[5] arguing that 1) a written form should have been used to obtain the defendant's consent to search the vehicle; 2) the defendant's vehicle was stopped and searched without reasonable suspicion or probable cause, in violation of the Fourth Amendment; 3) the scope of the traffic stop was unlawfully expanded; and 4) the defendant did not voluntarily consent to the search of his vehicle. (See Mot. to Suppress, filing 11.) The magistrate judge rejected each of the defendant's arguments and has recommended that the defendant's motion be denied. (See Tr. at 77:18-80:3, 80:13-14; see also filing 14.)

## II. ANALYSIS

      The defendant objects to the magistrate judge's findings that the trooper had probable cause to stop the defendant's vehicle; that the trooper lawfully expanded the scope of the traffic stop; and that the defendant consented voluntarily to the search of his vehicle. (See filing 25.) I shall consider each of these objections in turn.

---

[5]The defendant's motion does not extend to any statements that he made after he was taken to the Nebraska State Patrol headquarters in Grand Island, Nebraska. (See Tr. at 74:4-21.)

### A. Whether the Trooper Had Probable Cause to Stop the Defendant's Vehicle

"An automobile stop is . . . subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." Whren v. United States, 517 U.S. 806, 810 (1996). "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Id. Indeed, "It is well established that a traffic violation–however minor–creates probable cause to stop the driver of a vehicle." United States v. Ramos-Caraballo, 375 F.3d 797, 801 (8th Cir. 2004) (quoting United States v. Hamby, 59 F.3d 99, 101 (8th Cir. 1995)). In this case, Trooper Roby testified that he determined that the defendant was committing a traffic violation (i.e., speeding) by: 1) visually estimating that the defendant's speed exceeded the posted 75 mile-per-hour speed limit when the defendant's vehicle first came into view; 2) "clocking" the defendant's speed at 77 miles per hour using radar; 3) visually estimating that the defendant's speed exceeded the 55 mile-per-hour speed limit in the construction zone; 4) "pacing" the defendant through the construction zone at speeds of approximately 60 miles per hour; and 5) obtaining a speed reading of 63.5 miles per hour from his Vascar unit. Indeed, it is undisputed that the defendant was speeding in the construction zone, as he admitted as much to Trooper Roby. Nevertheless, the defendant argues that Trooper Roby did not have probable cause to stop his vehicle for speeding.

The defendant's argument is based upon Nebraska Revised Statute § 60-6,192, which states, in relevant part, as follows.

> (1) Determinations made regarding the speed of any motor vehicle based upon the visual observation of any peace officer, while being competent evidence for all other purposes, shall be corroborated by the use of a radio microwave, mechanical, or electronic speed measurement device. The results of such radio microwave, mechanical, or electronic speed measurement device may be accepted as competent evidence of the speed of such motor vehicle in any court or legal proceeding when the speed of the vehicle is at issue. Before the state may offer in evidence the results of such radio microwave, mechanical, or electronic speed measurement device for the purpose of establishing the speed of any motor vehicle, the state shall prove the following:
>
> (a) The radio microwave, mechanical, or electronic speed measurement device was in proper working order at the time of conducting the measurement;
>
> (b) The radio microwave, mechanical, or electronic speed measurement

>     device was being operated in such a manner and under such conditions so as to allow a minimum possibility of distortion or outside interference;
>
>     (c) The person operating the radio microwave, mechanical, or electronic speed measurement device and interpreting such measurement was qualified by training and experience to properly test and operate the radio microwave, mechanical, or electronic speed measurement device; and
>
>     (d) The operator conducted external tests of accuracy upon the radio microwave, mechanical, or electronic speed measurement device, within a reasonable time both prior to and subsequent to an arrest being made, and the device was found to be in proper working order.

Neb. Rev. Stat. Ann. § 60-6,192(1) (LexisNexis 2002). The defendant claims that since the government failed to satisfy the foundational requirements of this statute, there was "no competent evidence" that would have given Trooper Roby probable cause to believe that a traffic violation had occurred. (Filing 26 at 6.)

The magistrate judge rejected the defendant's argument and determined that § 60-6,192 simply does not apply in this context. (See Tr. at 80:5-12.) I agree. The Nebraska Court of Appeals has held consistently that the government need not lay the foundation specified in § 60-6,192 in order to establish that a traffic stop predicated on speeding was supported by probable cause. See Taylor v. Wimes, 632 N.W.2d 366, 372 (Neb. Ct. App. 2001); State v. Hiemstra, 579 N.W.2d 550, 556-57 (Neb. Ct. App. 1998), disapproved on other grounds by State v. Trampe, 668 N.W.2d 281 (Neb. Ct. App. 2003); see also, e.g., State v. Aldana, No. A-01-069, 2002 WL 857346, at *3 (Neb. Ct. App. 2002). Indeed, the Court of Appeals has stated explicitly that "[w]here the actual speed of the driver's vehicle is not at issue, the officer's estimate that the driver is exceeding the speed limit need not be confirmed with electronic or mechanical speed measurement devices to confer probable cause on the officer to make a stop." Taylor, 632 N.W.2d at 372. Therefore, it seems to me that § 60-6,192 is not intended to apply in the manner that the defendant suggests.

I find that the Trooper's visual estimates of the defendant's speed were sufficient to provide him with probable cause to stop the defendant even if his radar and Vascar speed estimates are disregarded. See Taylor, 632 N.W.2d at 372; Hiemstra, 579 N.W.2d at 556. Moreover, it is undisputed that the defendant was driving at 60 miles per hour in a 55 mile-per-

hour construction zone and, as I noted above, even minor traffic violations provide probable cause to stop vehicles.  See United States v. Ramos-Caraballo, 375 F.3d 797, 801 (8th Cir. 2004); cf. United States v. Neumann, 183 F.3d 753, 755-56 (8th Cir. 1999) (noting that officer had probable cause to stop the defendant for speeding because he was traveling five miles per hour over the speed limit).  Therefore, I find that Trooper Roby stopped the defendant's vehicle lawfully, and I shall overrule the defendant's first objection to the magistrate judge's report and recommendation.

### B.    Whether the Scope of the Traffic Stop Was Expanded Lawfully

When a law enforcement officer lawfully stops a driver, he is "entitled to conduct an investigation 'reasonably related in scope to the circumstances which justified the interference in the first place.'" United States v. Jones, 269 F.3d 919, 924 (8th Cir. 2001) (quoting Terry v. Ohio, 392 U.S. 1, 20 (1968)).  For example, "Once [an] officer makes [a] traffic stop, the officer may lawfully check the driver's license and registration, ask the driver about his destination and purpose, and request that the driver sit inside the patrol car."  United States v. Brown, 345 F. 3d 574, 578 (8th Cir. 2003).  The officer may also run computer checks to determine whether the driver has a criminal history or outstanding arrest warrants.  See Jones, 269 F.3d at 924.  There appears to be no dispute that Trooper Roby's investigation was "reasonably related in scope" to the speeding violation up until the moment when the trooper returned the defendant's paperwork.  Conversely, there appears to be no dispute that after the trooper returned the defendant's paperwork, the investigation was no longer reasonably related to the speeding violation.  The defendant argues that this latter phase of the investigation violated the Fourth Amendment because it was not justified by a reasonable suspicion of criminal activity.[6]  I disagree.

An officer may expand the scope of a traffic stop if the driver's responses and the circumstances give rise to a reasonable suspicion that criminal activity unrelated to the traffic stop is afoot.  See United States v. Barahona, 990 F.2d 412, 416 (8th Cir. 1993); United States v.

---

[6] I note parenthetically that the Fourth Amendment is not implicated in a consensual encounter between law enforcement officers and citizens; however, the government has not argued that the encounter between the defendant and Trooper Roby became consensual after the trooper returned the defendant's papers.  See, e.g., United States v. Santos-Garcia, 313 F.3d 1073, 1078 (8th Cir. 2002); United States v. Jones, 269 F.3d 919, 925-26 (8th Cir. 2001).

8

Ramos, 42 F.3d 1160, 1163 (8th Cir. 1994) ("If reasonably related questions raise inconsistent answers, or if the licenses and registration do not check out, a trooper's suspicions may be raised so as to enable him to expand the scope of the stop and ask additional, more intrusive, questions. If, however, no answers are inconsistent and no objective circumstances supply the trooper with additional suspicion, the trooper should not expand the scope of the stop.")  "Whether an officer has reasonable suspicion to expand the scope of a traffic stop is determined by looking at 'the totality of the circumstances, in light of the officer's experience.'"  United States v. Linkous, 285 F.3d 716, 720 (8th Cir. 2002) (quoting United States v. Dodson, 109 F.3d 486, 488 (8th Cir.1997)).  "Though each factor giving rise to suspicion might appear to be innocent when viewed alone, a combination of factors may warrant further investigation when viewed together."  Id.

     During his lawful investigation of the traffic violation, Trooper Roby noticed that the defendant seemed not to know the name of the friend who loaned him the vehicle he was driving.  The trooper also learned that the defendant was not sure how long he planned to stay at his destination; that the defendant did not have the address of the family members he was going to visit;[7] and that the defendant had a criminal record that included drug offenses.  As the magistrate judge noted, the trooper was aware too that the defendant was making a "fast trip," and that he had left Utah at 4 p.m. on the previous day.  (Tr. at 78:24-25.)  The defendant argues that each of these circumstances–save his criminal history–has an innocent explanation, and that his criminal history alone cannot provide a basis for expanding the scope of the stop.  (See filing 26 at 7-9.)  This may well be true; in particular, I agree that a significant number of innocent travelers might plan on making a "fast trip" without predetermining precisely how long the trip will last, and it seems to me that the suspicion engendered by the fact that the defendant did not know how to reach his final destination is mitigated by evidence that the defendant planned to telephone his family when he reached Omaha.  However, I find that when the facts and circumstances noted by

---

[7]The magistrate judge also found that it was reasonable for Trooper Roby to infer that the defendant did not know where he was going because the trooper knew that Interstate 80 has no exits numbered 60 or 72 in Omaha.  (See Tr. at 26:3-19, 79:3-6.)  However, as the magistrate judge recognized, Interstate 80 does have exits in Omaha at 60th and 72nd Streets. (See id. at 55:22-56:11; 79:3-6.)

the trooper are viewed in combination, "further investigation" was warranted. United States v. Linkous, 285 F.3d 716, 720 (8th Cir. 2002).

The defendant also argues that the facts of this case are analogous to those described in United States v. Ramos, 42 F.3d 1160 (8th Cir. 1994). In Ramos, two brothers were stopped by a state trooper who noticed that one of the brothers was not wearing his seat belt. See id. at 1161. The trooper asked for the brothers' drivers' licenses and questioned the men about their destination. See id. at 1161-62, 1163. The brothers answered the trooper's questions consistently, stating that they were going to Chicago to visit a sick cousin. See id. at 1163. Their licenses were "clean," their vehicle had not been reported stolen, and they did not appear nervous. See id. at 1161, 1163. Nevertheless, the trooper asked one of the brothers whether the men had any drugs or guns. See id. at 1162. Upon receiving a negative answer to this question, the trooper asked for permission to search the vehicle. See id. The district court concluded that the trooper had a "sufficient objective basis" to expand the scope of the stop, noting that the brothers' vehicle "was on an interstate highway with out-of-state plates," and that the brothers "were not certain about the part of Chicago that was their destination." Id. at 1163. The Eighth Circuit disagreed, stating,

> All of these facts were consistent with innocent behavior. Of course, that is not in itself sufficient to negative the existence of reasonable articulable suspicion under Terry. A trained officer may properly infer from a collection of circumstances, no one of which itself indicates illegal activity, that further inquiry is appropriate. In the present case, though, the collection of circumstances relied on is simply insufficient.

Id.

There are a number of similarities between Ramos and the instant case. For example, in both cases the defendants' licenses were valid and their vehicles were not stolen. Also, none of the defendants appeared nervous, and in each case the driver did not know precisely where his final destination was. However, unlike Ramos, in this case the trooper's suspicions were not aroused merely by the defendant's out-of-state license plates and his lack of familiarity with his final destination. See Ramos, 42 F.3d at 1163. As I noted above, Trooper Roby also learned that the defendant's record included arrests for possession of cocaine and possession of heroin; that the defendant seemed unable to name the "friend" who owned the vehicle without studying the

10

insurance card; and that the defendant was taking a "fast trip" of unspecified duration. Given the totality of the circumstances, Trooper Roby's decision to expand the scope of the stop was supported by a reasonable suspicion of criminal activity. I therefore overrule the defendant's objection to the magistrate judge's conclusion that the scope of the traffic stop was expanded lawfully.

### C. Whether the Defendant Consented Voluntarily to the Search of His Vehicle

There appears to be no dispute that the defendant consented to the search of his vehicle; however, the defendant objects to the magistrate judge's finding that the defendant consented voluntarily.

"A consensual search does not violate the Fourth Amendment if the consent was voluntarily given without coercion." United States v. Brown, 345 F.3d 574, 579 (8th Cir. 2003) (quoting United States v. White, 42 F.3d 457, 459 (8th Cir. 1994)). "Whether consent is voluntary depends upon the 'totality of the circumstances.'" United States v. Sanchez, 156 F.3d 875, 878 (8th Cir. 1998) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973)). Specifically, courts must consider "'the characteristics of the person giving consent' and 'the encounter from which the consent arose.'" United States v. Contreras, 372 F.3d 974, 977 (8th Cir. 2004) (quoting Sanchez, 156 F.3d at 878). "Relevant characteristics of the consenting party include age, intelligence and education; chemical intoxication (if any); whether the individual was informed of the right to withhold consent; and whether the suspect generally understood the rights enjoyed by those under criminal investigation." Id. (quoting Sanchez, 156 F.3d at 878); see also Brown, 345 F.3d at 579. Relevant aspects of the encounter include "the length of time that the suspect was detained and questioned; whether the police intimidated the suspect; whether the suspect relied upon promises or misrepresentations made by the police; whether the suspect was in custody when the consent was given; whether the encounter occurred in a public or secluded place; and whether or not the suspect objected to the search." Sanchez, 156 F.3d at 878.

I have considered the totality of the circumstances, and I conclude that the defendant did consent voluntarily to the search of his vehicle. There is no evidence that the defendant has any

11

educational, intellectual, or age-related[8] limitations that might have affected the voluntariness of his consent, and there is no evidence of intoxication. The defendant had been detained for a short time before he consented to the search, and there is no evidence of intimidation or coercion. The trooper and the defendant are not within the field of view of the trooper's video camera during their conversation; however, the audible portion of the tape establishes that Trooper Roby spoke to the defendant calmly and politely throughout the encounter. The tape also demonstrates that the defendant understands the English language, though it is true that the trooper had difficulty understanding the defendant's pronunciation of certain words. The trooper offered no promises or other inducements to persuade the defendant to give his consent, and I note that the defendant did not object to the search, but consented readily to the trooper's request.

The defendant's papers had been returned to him, and he was not under arrest when the trooper asked for permission to search his vehicle. However, the defendant was not informed that he had the right to withhold consent. Although the defendant does have prior experience with the criminal justice system, it is not apparent that he "generally understood the rights enjoyed by those under criminal investigation." Contreras, 372 F.3d at 977. In addition, I note that the encounter occurred while the defendant was seated in the trooper's patrol car. This, it seems to me, generates a certain coercive pressure that might not exist if the defendant were questioned while he remained seated in his own vehicle. These facts weigh in favor of a finding that the defendant's consent was not given voluntarily. Nevertheless, on balance and in view of the totality of the circumstances, I find that the defendant's consent was voluntary.[9]

The defendant argues that Trooper Roby "psychologically manipulate[d]" the defendant to consent to the search. (Filing 26 at 9.) Specifically, the defendant claims that Trooper Roby's "politely asked, yet persistent, line[] of questioning" was designed to manipulate the defendant

---

[8]The defendant was approximately 22 years of age at the time of his encounter with Trooper Roby, (See Ex. 2).

[9]I also find that Trooper Roby reasonably believed that the defendant's consent was voluntary, given the facts and circumstances described above. See Contreras, 372 F.3d at 977 ("[I]f law enforcement officers reasonably believed that the defendant consented voluntarily, then the search is lawful under the Fourth Amendment.").

into making "affirmative responses." (Id.) I agree that the trooper questioned the defendant politely, but I see no evidence of manipulation or trickery. I must therefore reject the defendant's argument.

Finally, I note in passing that the defendant argues that the "consent obtained by Roby was [not] 'sufficiently an act of free will to purge the primary taint'" of the illegal traffic stop and the illegal expansion of that stop. (Filing 26 at 10 (quoting Wong Sun v. United States, 371 U.S. 471, 486 (1963)). See also United States v. Ramos, 42 F.3d 1164 (8th Cir. 1994). However, since the traffic stop and the expansion of the scope of that stop were lawful, there is no "primary taint" to purge.

The initial stop of the defendant's vehicle was lawful; the subsequent expansion of the scope of the traffic stop was supported by a reasonable suspicion of criminal activity; and the defendant consented voluntarily to the search of his vehicle. Therefore, I must overrule the defendant's objections to the magistrate judge's report and recommendation and deny the defendant's motion to suppress.

**IT IS ORDERED** that:

1. The defendant's objections to the magistrate judge's report and recommendation, filing 25, are overruled;

2. The magistrate judge's report and recommendation, filing 14, is adopted; and

2. The defendant's motion to suppress, filing 11, is denied.

Dated August 30, 2005.

                BY THE COURT

                s/ Warren K. Urbom
                United States Senior District Judge